# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SOMSY THONGLEUTH,         )
                                  )
               **Plaintiff,**       )
                                  )    **CIVIL ACTION**
**v.**                            )
                                  )    **No. 10-1101-JWL**
                                  )
MICHAEL J. ASTRUE,         )
**Commissioner of Social Security,**   )
                                  )
              **Defendant.**     )
_____ )

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security (hereinafter Commissioner) denying disability insurance benefits (DIB) and supplemental security income (SSI) under sections 216(i), 223, 1602, and 1614(a)(3)(A) of the Social Security Act. 42 U.S.C. §§ 416(i), 423, 1381a, and 1382c(a)(3)(A) (hereinafter the Act). Finding no error as alleged by Plaintiff, the Commissioner's decision is AFFIRMED.

## I.	Background

Plaintiff applied for DIB and SSI on January 7, 2009 alleging disability since January 1, 2007. (R. 13, 111-18). The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge (ALJ). (R. 13, 44-47, 65). Plaintiff's request was granted, and Plaintiff appeared with counsel for a hearing before ALJ Edmund C. Werre on September 17, 2009. (R. 13, 23-

43). At the hearing, testimony was taken from a vocational expert, and from Plaintiff through an interpreter. (R. 23-43). Plaintiff testified that she went to first and second grade in Laos but had no further education, that she had been in the United States twenty years at the time of the hearing, and that she speaks and understands English "A little bit." (R. 27-28). On November 2, 2009, ALJ Werre issued his decision finding that although Plaintiff has a combination of impairments which is severe, is unable to perform her past relevant work, and is illiterate and unable to communicate in English, there are a significant number of jobs in the national economy that she is able to perform. (R. 13-22). As a result, he found that she is not disabled within the meaning of the Act, and denied her applications. (R. 21-22).

Plaintiff disagreed with the decision, requested Appeals Council review, and submitted a brief to the Council explaining her reasons. (R. 4-9). The Appeals Council considered Plaintiff's reasons, but found no basis under its rules to review the decision, and denied Plaintiff's request for review. (R. 1-3). Therefore, the ALJ's decision is the final decision of the Commissioner. (R. 1); Blea v. Barnhart, 466 F.3d 903, 908 (10th Cir. 2006). Plaintiff now seeks judicial review of that decision. (Doc. 1).

## II.    Legal Standard

The court's jurisdiction and review are guided by the Act. Wall v. Astrue, 561 F.3d 1048, 1051-52 (10th Cir. 2009) (citing 42 U.S.C. § 405(g)). Section 405(g) of the Act provides that, "The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." The court must determine whether the factual

findings are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than a scintilla, but less than a preponderance, and it is such evidence as a reasonable mind might accept to support a conclusion.  Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).  The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency."  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005).  The determination of whether substantial evidence supports the Commissioner's decision, however, is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

An individual is under a disability only if that individual can establish that she has a physical or mental impairment which prevents her from engaging in substantial gainful activity and which is expected to result in death or to last for a continuous period of at least twelve months.  Thompson v. Sullivan, 987 F.2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)); see also, Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir. 1985) (quoting identical definitions of a disabled individual from both 42 U.S.C. §§ 423(d)(1) and 1382c(a)(3)(A)); accord, Lax, 489 F.3d at 1084 (citing 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A)).  The claimant's impairments must be of such severity that she is not

only unable to perform her past relevant work, but cannot, considering her age, education, and work experience, engage in any other substantial gainful work existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner uses a five-step sequential process to evaluate disability. 20 C.F.R. §§ 404.1520, 416.920 (2009); Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether she has a severe impairment, and whether the severity of her impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1). Williams, 844 F.2d at 750-51. If claimant's impairment(s) does not meet or equal a listed impairment, the Commissioner assesses residual functional capacity (RFC). 20 C.F.R. §§ 404.1520(e), 416.920(e). This assessment is used at both step four and step five of the sequential process. Id.

After assessing claimant's RFC, the Commissioner evaluates steps four and five-- whether claimant can perform her past relevant work, and whether, when considering vocational factors of age, education, and work experience, claimant is able to perform other work in the economy. Wilson, 602 F.3d at 1139 (citing Lax, 489 F.3d at 1084). In steps one through four the burden is on claimant to prove a disability that prevents

4

performance of past relevant work. <u>Blea v. Barnhart</u>, 466 F.3d 903, 907 (10th Cir. 2006); <u>accord</u>, <u>Dikeman v. Halter</u>, 245 F.3d 1182, 1184 (10th Cir. 2001); <u>Williams</u>, 844 F.2d at 751 n.2. At step five, the burden shifts to the Commissioner to show jobs in the economy within Plaintiff's capacity. <u>Id.</u>; <u>Haddock v. Apfel</u>, 196 F.3d 1084, 1088 (10th Cir. 1999).

Plaintiff makes four claims of error. She claims the ALJ erred at step two of the sequential evaluation process by finding that Plaintiff's adjustment disorder with depressed mood is not a "severe" impairment; erred between steps three and four, both by failing to properly assess an RFC and by failing to make a proper credibility finding; and erred at step five in finding a significant number of jobs in the national economy which Plaintiff is capable of performing. The Commissioner argues that the ALJ properly evaluated Plaintiff's affective disorder; that substantial evidence supports the ALJ's credibility finding; and that the ALJ properly assessed Plaintiff's RFC and properly made and supported his step five determination. The court finds that the ALJ applied the correct legal standard and substantial evidence supports his decision. The court will address each of Plaintiff's arguments in the order of the sequential evaluation process.

## III.    The Step Two Evaluation

The ALJ performed his step two analysis on pages three through five of the decision. (R. 15-17). He concluded at step two that Plaintiff has several impairments which are "severe" within the meaning of the Act:  cervical strain and low back pain, plantar fasciitis, and a history of left wrist ganglion cyst. (R. 15). He noted that Plaintiff has also been diagnosed with an adjustment disorder with depressed mood, but that there

is no record of treatment, therapy, or hospitalization specifically for that disorder.  Id.  He

applied the psychiatric review technique promulgated in 20 C.F.R. §§ 404.1520a and

416.920a, and concluded that Plaintiff has "no" mental limitations in the functional area

of activities of daily living; has "mild" mental limitations in the functional areas of social

functioning and of concentration, persistence, or pace; and has experienced "no" episodes

of decompensation.  (R. 16).  In accordance with 20 C.F.R. §§ 404.1520a(d)(1), and

416.920a(d)(1), he concluded that Plaintiff's mental impairments are not severe.  Id.  He

went on to note that the findings in the four broad mental functional areas which result

from application of the psychiatric review technique at steps two and three are not a

mental RFC assessment, but that he had incorporated the results of that analysis into his

RFC assessment.  (R. 17).

Plaintiff notes that the threshold for finding a "severe" impairment is de minimis,

and claims it was error to determine her mental impairments are not severe.  This is so,

she argues, because the examining psychiatrist, Dr. Schwartz, diagnosed Plaintiff with

adjustment disorder with depressed mood; other physicians diagnosed her with

depression; and the state agency psychological consultant assessed "moderate" limitations

in social functioning and in concentration, persistence, or pace.  She argues that the ALJ

did not explain how he found mild limitations "when other medical professionals have

found greater limitations," and the ALJ is not a medical expert and is not entitled to

render his own medical opinion.  (Pl. Br. 10).  The Commissioner argues that the mere

presence of a mental impairment does not entitle a claimant to a finding of a severe

mental impairment, that the ALJ properly explained his rationale regarding Plaintiff's mental impairments, and his rationale is supported by substantial evidence in the record. The court agrees with the Commissioner.

A mental impairment is not severe if it does not significantly limit plaintiff's mental ability to do basic work activities such as understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521, 416.921. The Tenth Circuit has interpreted the regulations and determined that to establish a "severe" impairment or combination of impairments at step two of the sequential evaluation process, plaintiff must make only a "de minimis" showing. Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997). Plaintiff need only show that an impairment would have more than a minimal effect on her ability to do basic work activities. Williams, 844 F.2d at 751. However, she must show more than the mere presence of a condition or ailment. Hinkle, 132 F.3d at 1352 (citing Bowen v. Yuckert, 482 U.S. 137, 153 (1987)). If an impairment's medical severity is so slight that it could not interfere with or have a serious impact on plaintiff's ability to do basic work activities, it could not prevent plaintiff from engaging in substantial work activity and will not be considered severe. Hinkle, 132 F.3d at 1352.

The Commissioner has promulgated a psychiatric review technique for evaluating mental impairments. 20 C.F.R. §§ 404.1520a, 416.920a. In evaluating the severity of mental impairments at step two, the technique provides for rating the degree of functional

limitation in each of four broad mental functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. §§ 404.1520a(c) 416.920a(c). After rating the degree of limitation in each functional area, the Commissioner determines the severity of plaintiff's mental impairments. Id. §§ 404.1520a(d), 416.920a(d). When the first three functional areas are rated as "none" or "mild," and the fourth area is rated as "none," the agency will conclude at step two of the sequential evaluation process that plaintiff's mental impairments are not severe "unless the evidence otherwise indicates that there is more than a minimal limitation in [plaintiff's] ability to do basic work activities." Id. §§ 404.1520a(d)(1), 416.920a(d)(1).

Here, the ALJ applied the Commissioner's psychiatric review technique, and in accordance with that technique found that Plaintiff's mental impairments are not severe. Plaintiff does not really complain about application of the technique, but argues that her condition meets the de minimis standard because she has been diagnosed with certain mental impairments, and the ALJ cannot have properly concluded that she has only mild limitations in social functioning and in concentration, persistence, or pace because the state agency psychologist determined she has moderate limitations in those functional areas. As the Commissioner points out, the mere diagnosis of depression or of adjustment disorder with depressed mood is insufficient to establish more than a minimal effect on Plaintiff's mental ability to perform basic work activities. Hinkle, 132 F.3d at 1352 ("the claimant must show more than the mere presence of a condition or ailment"). So the real issue is whether the ALJ properly determined that Plaintiff has "mild" limitations in these

8

two functional areas although the state agency psychological consultant opined that she has "moderate" limitations in these areas.  The court finds that he properly did so.

In his discussion of the functional areas of social functioning, and of concentration, persistence, or pace, the ALJ acknowledged that Plaintiff had undergone a consultative mental status examination by a psychologist, Dr. Schwartz, and that Dr. Schwartz made findings which might be interpreted differently than the ALJ did:

> The next functional area is social functioning.  In this area, the claimant has mild limitation.  At the request of the State agency the claimant underwent a mental status examination with Michael Schwartz, Ph.D. who noted that the claimant's affect was sullen and disgusted, and that the claimant stated her mood was angry.  Dr. Schwartz opined the claimant appeared to have difficulty getting along with others; however he was uncertain how accurate that assessment was as he did not believe the claimant had fully cooperated in the examination (Exhibit 8F).  The claimant testified at hearing that she had no problems getting along with people in the workplace, or otherwise.  Based upon consideration of the record as a whole, the undersigned finds that the claimant has at most mild limitation in social functioning as a result of her adjustment disorder with depressed mood.

> The third functional area is concentration, persistence or pace.  In this area, the claimant has mild limitation.  The claimant reported she had difficulty in memory and concentration (Exhibit 8E).  Following a mental status examination, Dr, Schwartz noted the claimant's test results suggested significant difficulties with attention and concentration; however, he questioned the claimant's effort (Exhibit 8F).  Despite her impairment the claimant is the primary caretaker for her 12-year-old daughter; has a current driver's license; and reported her primary hobby is watching television all day (Exhibit 8E).  There is little in the record to indicate the claimant has significant difficulties in concentration, persistence or pace, and if she does that these difficulties are as a result of her mental impairment, rather than her physical impairments.  Based upon consideration of the record as a whole, the undersigned finds that the claimant has at most mild limitation in concentration, persistence or pace as a result of her adjustment disorder with depressed mood.

(R. 16).

As the ALJ's discussion suggests, Dr. Schwartz opined that "[Plaintiff] does appear to have difficulty getting along with others, but I am not sure how cooperative she was, so I do not believe I can make a clear judgement in this regard." (R. 309). The ALJ noted Dr. Schwartz's statement that Plaintiff's "responses would suggest she has some significant difficulties with attention and concentration." Id. He noted that Dr. Schwartz questioned Plaintiff's effort in completing the tests. (R. 16) (citing Ex. 8F (R. 308-09)).

As quoted above, the ALJ considered the record as a whole, along with Dr. Schwartz's report and Dr. Schwartz's concern about Plaintiff's cooperation in the examination and the effort with which she responded to testing, and determined that Plaintiff's limitations in social functioning and in concentration, persistence, or pace are "mild." (R. 16). Moreover, as the Commissioner pointed out, Plaintiff reported to her treating nurse-practitioner that her medication was "helping her mood." (Comm'r Br. 11) (citing (R. 334)). The court finds that the ALJ's analysis is supported by substantial evidence in the record, especially Dr. Schwartz's report.

In her reply brief, Plaintiff pointed out that the ALJ did not state that Plaintiff's medication was helping her mood, and argues that the Commissioner's assertion of that fact in his brief is merely post hoc rationalization which counsel may not create, and upon which the court may not rely to affirm the decision. (Reply 2) (citing Haga v. Astrue, 482 Fed. 3d 1205, 1207-08 (10th Cir. 2007); Robinson v. Barnhart, 366 F.3d 1078, 1084-85 (10th Cir. 2004); and Allen v. Barnhart, 357 F.3d 1140, 1142, 1154 (10th Cir. 2004)). As

Plaintiff's argument implies, an ALJ's decision should be evaluated based solely on the reasons stated in the decision. Robinson, 366 F.3d at 1084. A decision may not be affirmed on the basis of appellate counsel's post hoc rationalizations for agency action; Knipe v. Heckler, 755 F.2d 141, 149 n.16 (10th Cir. 1985); and a reviewing court may not create post hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision. Grogan v. Barnhart, 399 F.3d 1257, 1263 (10th Cir. 2005). Nonetheless, it is the court's duty to determine whether the Commissioner's decision is supported by substantial evidence in the record. Lax, 489 F.3d at 1084; accord, White, 287 F.3d at 905.

In light of this duty, Plaintiff reads the restriction on post hoc rationalization too broadly. The court may not construct, and here it has not constructed, a rationale for the Commissioner. The ALJ determined "the record as a whole" required finding Plaintiff's limitations in these two functional areas are "at most mild." (R. 16). Since the ALJ made that finding, it is the court's duty to determine whether it is supported by substantial evidence in the record as a whole. As the Commissioner pointed out, the fact Plaintiff reported that her medication helped her mood is one more piece of record evidence which supports the rationale given by the ALJ for his determination. The court need not, indeed may not, ignore that evidence merely because it was not specifically cited in the decision.

Plaintiff also argues that the ALJ erred in finding only "mild" limitations because "The state agency concluded that . . . Thongleuth would have moderate limitations" in these two functional areas. (Pl. Br. 10). As Plaintiff's argument suggests, the state

agency applied the psychiatric review technique at the reconsideration level of adjudication in this case. In doing so, a psychologist, Dr. Carol Adams, reviewed the record evidence, completed both a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form, and found that Plaintiff is "moderately limited" in the two broad functional areas of social functioning and concentration, persistence, or pace. (R. 312-29). Plaintiff's reliance upon these reports, however, is misplaced because the ALJ considered and gave "limited weight to the psychological assessments provided by the State agency." (R. 19). He explained, "These assessments are not consistent with or supported by the record as a whole, and therefore are entitled to little weight." Id. Further, Plaintiff provides no argument that the ALJ erred in weighing Dr. Adam's opinions. The court finds no error in the step two analysis.

## IV. RFC Assessment

An RFC assessment is made if the ALJ finds at step three of the evaluation process that Plaintiff's condition does not meet or equal the severity of a listed impairment, and that RFC assessment will be used to determine whether Plaintiff can perform work at both step four and step five of the process. 20 C.F.R. §§ 404.1520(e), 416.920(e). In assessing RFC, the Commissioner considers a claimant's ability to meet the demands of work despite her impairment(s). Id. at §§ 404.1545-1546, 416.945-946. The assessment is based upon all relevant evidence in the record and includes consideration of the limitations caused by all of the claimant's impairments, including impairments which are not "severe" as defined in the regulations. Id. at §§ 404.1545(a & e), 416.945(a & e).

The assessment considers physical abilities such as sitting, standing, walking, lifting, carrying, pushing, pulling, reaching, handling, stooping, and crouching; and mental abilities such as understanding, remembering, and carrying out instructions; and responding appropriately to supervision, co-workers, and work pressures.  Id. §§ 404.1545(b & c), 416.945(b & c); see also §§ 404.1521, 416.921 (listing examples of basic work activities which may be affected by impairments).  At the hearing level, it is the ALJ's responsibility to assess RFC.  Id. §§ 404.1546(c), 416.946(c).

The Commissioner issued Social Security Ruling (SSR) 96-8p, "To state the Social Security Administration's policies and policy interpretations regarding the assessment of residual functional capacity (RFC) in initial claims for disability benefits."  West's Soc. Sec. Reporting Serv., Rulings 143 (Supp. 2010).  The Ruling includes narrative discussion requirements for an RFC assessment.  Id. at 149.  The discussion is to cite specific medical facts and nonmedical evidence to describe how the evidence supports each conclusion, discuss how the Plaintiff is able to perform sustained work activities, and describe the maximum amount of each work activity the plaintiff can perform.  Id. The discussion must include an explanation how any ambiguities and material inconsistencies in the evidence were considered and resolved.  Id.  It must include consideration of the credibility of Plaintiff's allegations of symptoms and consideration of medical opinions regarding plaintiff's capabilities.  Id. at 149-50.

Because an RFC assessment must include consideration of the credibility of Plaintiff's allegations of symptoms, the court will consider Plaintiff's credibility at this

point in its analysis. Plaintiff claims the ALJ erroneously discounted the credibility of Plaintiff's allegations in four respects. She claims the ALJ: (1) failed to consider "the limitations testified to by Thongleuth," (Pl. Br. 14); (2) "failed to discuss, much less consider, the side effects of Thongleuth's prescribed medications on her ability to work," (Pl. Br. 15); (3) "unfairly and irrationally" used Plaintiff's financial interest to discount her credibility, id.; and (4) relied upon inconsistencies which "are not clear evidence of lack of credibility" when Plaintiff's difficulties with English and "the obvious inadequacy of the interpreter" are considered. Id. The Commissioner argues that the ALJ applied the proper standard to his credibility determination and that substantial evidence in the record supports his determination, and therefore the determination should be affirmed.

An ALJ's credibility determinations are generally treated as binding on review. Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990). "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence. Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005). Therefore, in reviewing the ALJ's credibility determinations, the court will usually defer to the ALJ on matters involving witness credibility. Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994). "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" Hackett, 395 F.3d at 1173(quoting Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988)).

In the narrative discussion of his RFC assessment, the ALJ stated that he had considered all of Plaintiff's allegations of symptoms, summarized the legal standard used in credibility determination, and summarized Plaintiff's allegations and the record medical evidence. (R. 18-19). He then provided a specific analysis relating his credibility finding, and stating four reasons he found Plaintiff's allegations not credible:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms and the claimant's allegations of an inability to work are not credible. [1] The claimant's allegations are not supported by the medical evidence. The claimant reports chronic severe pain in her neck, back, and hips, yet all testing has been within normal limits. The claimant testified she had severe pain when using her left hand, yet testing revealed only diminished grip strength, and all other testing, including a nerve conduction study, were negative. A trier of fact is required to determine a witness'[s] credibility in consideration of all the circumstances, including the extent to which his [sic] testimony is contradicted or corroborated by other evidence, and any other circumstances that tend to shed light upon her credibility. Additionally, [2] the claimant's financial interest in the outcome and [3] the evidentiary inconsistencies detract from reliance on the claimant's testimony as a basis for decision-making. The undersigned finds that although she has medically determinable severe impairments, these impairments do not cause the degree of limitations alleged by the claimant. When evaluated, the claimant's subjective complaints are found to be [4] exaggerated and inconsistent with the other evidence, including the clinical and objective findings of record and are not a sound basis for decision-making.

(R. 19-20) (emphasis added, numbering added).

Plaintiff's first allegation of error is incomprehensible in the circumstances of this case. She argues, "The ALJ failed to consider the limitations testified to by Thongleuth in making the determination that she can sustain competitive fulltime employment." (Pl.

Br. 14). Plaintiff does not point to any alleged limitation which was ignored or inadequately considered by the ALJ. Moreover, the ALJ included a summary of Plaintiff's allegations:

> The claimant alleged she is unable to work due to pain in her left hand, neck, hips and left foot. The claimant testified she has weakness on her left side and feels weak and "shaky." The claimant estimated she could stand on her feet approximately 30 minutes before needing to sit; that she could walk around inside a store for 40 to 50 minutes; and that she could sit for about 30 minutes. She reported that after alternating sitting and standing she would need to lie down for an hour. The claimant reported she continues to take pain medication.

(R. 18). The court's review of the record reveals that the ALJ's summary is a fair and adequate summary of Plaintiff's testimony. Clearly the ALJ considered the limitations testified to by Plaintiff, despite her protestation to the contrary.

Plaintiff's second allegation of error (that the ALJ failed to consider or discuss the side effects of her medication) is similarly unpersuasive. As Plaintiff points out, the ALJ did not discuss the side effects of her medication as they might relate to the credibility of her allegations. However, as the Commissioner asserts, there is simply no evidence in the record that Plaintiff's medications produced any side effects. In fact, Plaintiff affirmatively reported that she has no side effects from her medications (R. 217), and she does not allege any side effects in her briefing to the court. If the ALJ's failure to mention side effects was error (and the court doubts it was), Plaintiff has shown no prejudice, and the error was harmless.

In her third allegation of error, Plaintiff claims the ALJ "unfairly and irrationally" used her financial interests to discount her credibility. As Plaintiff argues, the ALJ noted that Plaintiff's financial interest in the outcome detracts from reliance on her testimony as a basis for decision-making. (R. 20). Plaintiff does not explain how this consideration is either unfair or irrational, and cites to no legal authority for the proposition that it is. Certainly Plaintiff will benefit financially from receiving DIB and/or SSI in this case, and this potential gain might serve as a motivating factor to seek benefits by one who is not truly disabled within the meaning of the Act. Moreover, that is not the sole reason, but is one of four reasons given by the ALJ to discount Plaintiff's credibility.

Finally, Plaintiff argues that the ALJ relied upon inconsistencies which "are not clear evidence of lack of credibility." (Pl. Br. 15). As quoted above, the fourth reason given by the ALJ for discounting Plaintiff's credibility was that Plaintiff's complaints are "exaggerated and inconsistent with the . . . clinical and objective findings of record." (R. 20). Plaintiff does not object to the ALJ's finding that Plaintiff's complaints are exaggerated. Moreover, she does not assert that the ALJ's finding of inconsistencies between her allegations and the record evidence is erroneous. Rather, she points to three examples from the record which in her view suggest that the inconsistencies found by the ALJ are not "clear evidence" of lack of credibility, but are merely misunderstandings resulting from Plaintiff's difficulties with English. (Pl. Br. 15-16).

In the first example, Plaintiff relates that "an accurate medical history was difficult to obtain" by Dr. Johnstone who performed an examination on Plaintiff. (Pl. Br. 15). Dr.

Johnstone was performing a consultation for Dr. Turner, Plaintiff's primary care physician at that time. (R. 229). As Plaintiff suggests, Dr. Johnstone stated that Plaintiff's "English is quite limited," and that "She is not employed, I believe, because of some type of disability involving her lower extremities although I couldn't quite get through the details due to the language barrier." Id. However, there is no indication the "language barrier" caused any problem with Dr. Johnstone's treatment of Plaintiff. He stated that he was treating Plaintiff for a "couple of issues"--a recurrent ganglion cyst, and abdominal pain. (R. 229). Nowhere does he indicate that he "couldn't quite get through the details" as to these two issues, probably because these issues were important to his treatment of Plaintiff, and he continued to inquire until he received sufficient information and understood the details. The reason for Plaintiff's unemployment however, did not relate to the purpose of Dr. Johnstone's treatment, and he did not need to clarify that issue. In any case, Dr. Johnstone never indicated that the language barrier affected his actual treatment at this time or through the period he treated Plaintiff. (R. 229-230).

In her second example, Plaintiff quotes a sentence from Dr. Turner's treatment notes in which the physician noted, "She is a Laotian and unfortunately the only Laotian speaker in Wichita is an internist, Dr. Bon Nola. It might be worthwhile to have her consult with him at some point." (Pl. Br. 15) (quoting (R. 277)). The complete relevant portion of the quoted treatment note is, "She really does not have any reason for gastroparesis. Wondering about sending her to see a gastroenterologist. She is Laotian and unfortunately the only Laotian speaker in Wichita is an internist, Dr. Bon Nola. It

might be worthwhile to have her consult with him at some point." (R. 277). In context, the point of the note is not that Dr. Turner was having communication difficulties with Plaintiff. Rather, he was wondering about sending Plaintiff to a gastroenterologist, but considering that it might be preferable to send her to an internist who spoke Laotian.

Finally, Plaintiff asserts that using an interpreter throughout the hearing may have confounded the ALJ's credibility evaluation because the interpreter did not repeat Plaintiff's testimony verbatim "but chose to 'interpret' [Plaintiff's] responses." (Pl. Br. 16). Specifically, she points to one instance in which the ALJ interrupted the interpreter, and sought clarification. Id. (citing (R. 29)). She then asserts that the ALJ's credibility finding was erroneous because of "the obvious inadequacy of the interpreter." Id.

Plaintiff's argument relates to the following colloquy between the ALJ and Plaintiff at the hearing:

Q     Have you attempted to work since then?

A     No, I'm not, she cannot work at all. No, she cannot even do the housework much --

Q     And did she --

A     -- or hold down a job.

Q     Did you work for Sara Lee in the past?

A     Yes, she did.

Q     Okay. She said more than yes, a yes answer, what did exact -

A     Yes, she did work for Sara Lee and then switched back to Rubbermaid.

Q      Okay. . . .

(R. 29).  This is the only instance in the record where the ALJ interrupted the interpreter, or where there is any indication that the interpreter may not have been translating "verbatim."  The ALJ understood his responsibility to control the hearing and to ensure the integrity of the proceedings, and he was clearly willing to question the interpreter when he sensed a problem.  Plaintiff presents no evidence that there was an on-going or continual problem.  Moreover, it is revealing to note that Plaintiff does not assert error in the interpretation, the qualifications of the interpreter, or the use of this particular interpreter.  Rather, she argues that the <u>credibility finding of the ALJ</u> was erroneous because of this "obvious inadequacy of the interpreter."

None of the three examples cited by Plaintiff relate to the ALJ's credibility determination, and Plaintiff provides no citation to testimony which was misunderstood by the ALJ or misinterpreted by the interpreter, and therefore resulted in an erroneous credibility finding.  Plaintiff has shown no error in the ALJ's credibility determination.

With regard to the remainder of the RFC assessment, Plaintiff claims error because (1) the ALJ relied upon an RFC assessment which was not prepared by an acceptable medical source; (2) the ALJ failed to consider how Plaintiff's non-severe mental impairments affected her RFC; (3) the ALJ failed to include limitations regarding Plaintiff's language difficulties; and (4) the ALJ failed to include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence.  The Commissioner argues that the RFC assessment was proper.

Plaintiff first argues that the ALJ erred in relying upon the RFC assessment of a Single Decision Maker (SDM) prepared at the initial consideration of Plaintiff's applications. As Plaintiff argues, the weight of persuasive authority is that an SDM opinion is not a medical opinion and is worthy of no weight in an ALJ's analysis. E.g., Ky v. Astrue, No. 08-cv-00362-REB, 2009 WL 68760 at *3 (D. Colo. Jan. 8, 2009) ("An SDM is not a medical professional of any stripe, and the opinion of an SDM therefore is entitled to no weight."); Stanley v. Astrue, No. 09-20485-CIV, 2009 WL 3060394 (S.D. Fla. Sept. 24, 2009) (remanding with directions not to rely upon determination by SDM); Smith v. Astrue, No. 3:07-cv-1165-J-TEM, 2009 WL 890391 at *11 (M.D. Fla. March 31, 2009) (ALJ improperly classified SDM as physician); Burnham v. Astrue, No. 06-124-P-H, 2007 WL 951386 at *2 (D. Me. March 27, 2007) (ALJ wrongly accorded weight to opinion of SDM).

Courts in this district with one exception, have uniformly recognized that an SDM is not a medical professional, and that her opinion is worthy of no weight as a medical opinion. Greenfield v. Astrue, No. 09-1173-WEB, 2010 WL 2132057, *4, n.5 (D. Kan. Apr. 26, 2010) (Report & Recommendation, adopted May 27, 2010, 2010 WL 2132061); Cowan v. Astrue, No. 09-1154-WEB, 2010 WL 2131915, *6 (D. Kan. Apr. 9, 2010) (Report & Recommendation, adopted May 27, 2010, 2010 WL 2132028); Kempel v. Astrue, No. 08-4130-JAR, 2010 WL 581900, *7 (D. Kan. Jan. 4, 2010); Houghtaling v. Astrue, No. 08-2656-KHV-GBC, slip op. at 2, 3, (D. Kan. Nov. 10, 2009); but see, Sawyer v. Astrue, No. 08-2114-KHV, 2009 WL 634666, *7 (D. Kan. March 11, 2009)

(relying upon opinion of SDM, among other evidence, as "medical evidence that plaintiff can work full-time").  In Sawyer, the only Kansas district court case accepting an SDM opinion as medical evidence, the court did not consider whether an SDM was a medical professional or whether such an opinion was worthy of weight as a medical opinion.

Here, the ALJ "considered the opinions of the State agency medical consultants, and [] accorded their physical assessments substantial weight."  (R. 19).  On the other hand, he gave "limited weight to the psychological assessments provided by the State agency."  Id.  Plaintiff asserts that in making this analysis, "the ALJ adopted the findings found in the assessment singed [sic] by Lind [sic] K. Stone, who is identified as a 'SDM.'" (Pl. Br. 12) (citing (R. 290-97) ("Physical Residual Functional Capacity Assessment" form, signed by a Single Decision Maker, Linda K. Stone)).  Although Plaintiff acknowledges that Ms. Stone's Physical RFC Assessment form was later affirmed by a physician, she argues that the ALJ believed the SDM was also a medical consultant, because he used the plural, "consultants."  Id.  She asserts that this is error requiring remand for a proper evaluation of the opinion of the SDM.  Id.  The Commissioner argues that the RFC assessment form completed by Ms. Stone was "adopted and affirmed by a medical professional," and thereby "became a medical opinion," and it was proper for the ALJ to rely upon that opinion.  (Comm'r Br. 14) (citing (R. 310) ("Case Analysis" form, signed by Dr. Siemsen, M.D., affirming RFC "as written")).  In her reply brief, Plaintiff argues based upon an unpublished 2009 decision of a court in this district that the ALJ's use of the plural reveals he must have been

laboring under the incorrect belief that the SDM was a doctor, which is reversible error. (Reply 2-3) (citing <u>Toon v. Astrue</u>, No. 07-1369-MLB, slip op. at 14-16 (D. Kan. Mar. 2, 2009) (Report and Recommendation) <u>adopted by the district court</u>, (Mar. 17, 2009)).[1]

The court agrees with the Commissioner that the opinion of the SDM was adopted by the reviewing medical consultant at the reconsideration level, and thereby became a "medical opinion" within the meaning of the Act and the regulations, and must be considered and weighed accordingly. The fact that the ALJ used the plural in referring to the "state agency consultants," and thereby mistakenly accorded equal weight to the opinions of the SDM and of the medical consultant which were contained in the same document, is of little significance in the circumstances. As Plaintiff noted, Exhibit 6F, was completed by the SDM on March 16, 2009, and as the opinion of an SDM is not a "medical opinion" within the meaning of the Act and regulations and carries no weight in the ALJ's evaluation of the medical evidence and the medical opinions. However, Plaintiff also admits that when Dr. Siemsen performed his review at the reconsideration level, he stated that "the RFC and and/or [sic] assessment of 3-16-09 is affirmed as written." (R. 310); <u>see also</u>, (Pl. Br. 12) (noting the SDM opinion "was affirmed by a Gerald Siemsen, M.D."); (Reply 3) (same. As Plaintiff admits and the Commissioner

---

[1]The Court notes that Plaintiff did not cite to an electronic reporting service, or attach the <u>Toon</u> opinion as an exhibit to her brief, as required by local rule. D. Kan. R. 7.6(c). Nonetheless, the court was able to find the <u>Toon</u> opinion on the Lexis electronic reporting service. <u>Toon v. Astrue</u>, No. 07-1369-MLB, 2009 U.S. Dist. LEXIS 125221 (D. Kan. Mar. 2, 2009) <u>adopted by the district court</u> 2009 U.S. Dist. LEXIS 83928 (Mar. 17, 2009). Counsel is cautioned to follow the local rules in the future.

argues, the SDM opinion was adopted by the medical consultant. The ALJ stated he gave the SDM/medical consultant opinion "substantial weight," and explained his reasons for assigning that weight:

> Although the State agency medical consultants did not examine the claimant, they provided specific reasons for their opinions about the claimant's residual functional capacity showing that these opinions were grounded in the evidence of record, including careful consideration of the objective medical evidence and the claimant's allegations regarding symptoms and limitations. The opinions are internally consistent and consistent with the evidence as a whole.

(R. 19).

The court's review of the evidence reveals support for the ALJ's rationale. The opinion reveals specific manipulative limitations in handling, fingering, and feeling; and explains what the limitations are, and why they were assessed. (R. 293). The opinion includes a careful discussion of the credibility of Plaintiff's allegations of symptoms. (R. 295). Moreover, the opinion includes an analysis and explanation supporting the RFC assessment with evidence in the record. (R. 297). Plaintiff does not argue that the ALJ's reasons are erroneous, but she argues that the ALJ's analysis must be rejected merely because he attributed "medical source" status to the SDM. She makes this argument despite acknowledging that the medical consultant reviewed and adopted the assessment. To reject the ALJ's analysis of the opinion merely because the opinion was originally authored by an SDM, despite the fact that it was subsequently adopted by a medical consultant, would be to elevate form over substance, and the court is unwilling to do so.

Plaintiff's citation to <u>Toon</u>, does not persuade the court otherwise. As Plaintiff argues, the court in <u>Toon</u> remanded, at least partly because, "the ALJ erroneously believed that a medical professional had authored the [SDM's RFC assessment] (even though the ALJ may have known that [a medical consultant] had adopted the findings in the Exhibit)." <u>Toon</u>, No. 07-1369-MLB, slip op. at 16, 2009 U.S. Dist. LEXIS 125221 at * 20. Nonetheless, several factors present in <u>Toon</u> are not present here, and justify a different result. In <u>Toon</u>, before the court considered the ALJ's evaluation of the SDM opinion, it had already determined that errors in the ALJ's credibility analysis required remand, and therefore analysis of the SDM/medical consultant opinion was, strictly speaking, unnecessary. <u>Id.</u>, slip op. at 5-13, U.S. Dist. LEXIS 125221 at * 6-17. In <u>Toon</u>, the Commissioner's response brief did not address the SDM/medical consultant opinion, and he did not make, and therefore forfeited, any argument that the ALJ was entitled to rely upon the medical consultant opinion even though the ALJ erroneously believed the SDM was a medical source. <u>Id.</u>, slip op. at 15 n.1, U.S. Dist. LEXIS 125221 at * 18 n.1. Finally, the record in <u>Toon</u> revealed that a treating physician had provided a physical RFC assessment to the Appeals Council after the ALJ's decision was made. Moreover, the treating physician's assessment was contrary to the SDM/medical consultant opinion, and the <u>Toon</u> court considered that assessment significant in deciding that remand was necessary for proper consideration of the SDM/medical consultant opinion. <u>Id.</u>, slip op. at 16 & n.2, U.S. Dist. LEXIS 125221 at * 20 & n.2 ("in light of the opinion of Dr.

Dorey, who had examined the plaintiff and stated that plaintiff had greater restrictions than those found by the ALJ").

Plaintiff's argument that the ALJ failed to consider how Plaintiff's non-severe mental impairments affected her RFC is primarily a continuation of her step two argument that her mental impairments are severe within the meaning of the Act. She argues that because Dr. Adams found "moderate" limitations in social functioning and in concentration, persistence, or pace; the ALJ should have included specific mental limitations in his RFC assessment. As explained in the step two analysis above, Plaintiff's reliance upon Dr. Adams's reports is misplaced because the ALJ gave "limited weight" to them. Further, Plaintiff does not argue that the ALJ erred in weighing them. Therefore, Plaintiff has shown no specific mental limitations which should have been included in the RFC assessment. Moreover, the ALJ stated he had assessed Plaintiff's RFC "After careful consideration of the entire record." (R. 18). Since Plaintiff has provided no basis to conclude the ALJ did not do as he said, the court will follow its general practice, which is "to take a lower tribunal at its word when it declares that it has considered a matter." Hackett, 395 F.3d at 1173.

Plaintiff next argues that the ALJ failed to include limitations in the RFC regarding Plaintiff's ability to speak English. (Pl. Br. 13). Plaintiff shows no error. At finding number eight, the ALJ stated: "The claimant is illiterate and is unable to communicate in English." (R. 20). While the ALJ's RFC assessment was made at finding number five and the finding of illiteracy and inability to communicate in English was made at finding

number eight, this is of no significance. In fact, it would be improper to include such factors in an RFC assessment, since RFC relates to physical, mental, and other physiological limitations in the ability to work. 20 C.F.R. §§ 404.1545, 416.945. "Illiteracy" and "Inability to communicate in English" on the other hand, are subsumed within the <u>vocational factor</u> of "education." 20 C.F.R. §§ 404.1564(b)(1 & 5), 416.964(b)(1 & 5). The regulations provide that vocational factors of age, education , and work experience will not be used until step five of the sequential evaluation process where it is determined whether there are a significant number of jobs which Plaintiff can perform, given her RFC and vocational factors of age, education, and work experience. 20 C.F.R. §§ 404.1560, 416.960. The ALJ did not err in failing to include Plaintiff's inability to communicate in English within the RFC assessed.

In her final RFC argument, Plaintiff claims the "ALJ's narrative does not link the medical evidence with the arbitrary limitations found within the RFC. The ALJ simply lists the medical evidence in the record then announces his conclusion without linking the evidence to the RFC." (Pl. Br. 13-14). Plaintiff appears to be arguing that the ALJ failed to provide a pinpoint citation to medical evidence in the record for each RFC finding, but that is not the standard required. What is required is that the narrative discussion describe how the evidence supports the RFC conclusions, and cite specific medical facts and nonmedical evidence supporting the RFC assessment. SSR 96-8, West's Soc. Sec. Reporting Serv., Rulings 149 (Supp. 2010). The ALJ's narrative discussion of his RFC assessment appears at pages six through eight of his decision (R. 18-20), and in that

discussion, he described how the evidence supports his RFC conclusions, and cited the specific medical facts and nonmedical evidence upon which he relied in making his assessment. Moreover, to the extent that the ALJ's analysis at pages three through five of his decision (steps two and three of the evaluation process) relate to his determination not to include mental limitations and not to include greater physical limitations in the RFC assessed, that analysis is also a part of the narrative discussion, citing medical facts and nonmedical evidence upon which he relied in making his assessment. (R. 15-17). As discussed above, the narrative discussion also included consideration of the credibility of Plaintiff's allegations of symptoms, and consideration of the medical opinions. More is not required. Plaintiff has shown no error in the ALJ's RFC assessment.

## V.     Step Five

In her last allegations of error, Plaintiff claims the ALJ erred at step five of the evaluation process by relying upon the vocational expert (VE) testimony, and gives three reasons supporting her argument. First, she claims the ALJ included nothing in his hypothetical questioning regarding Plaintiff's ability to speak English. She also claims the VE merely speculated regarding the number of jobs available in the economy for someone with the RFC, age, education, and work experience of Plaintiff. Finally, she claims that because the ALJ found Plaintiff is illiterate and unable to communicate in English, and because the representative jobs listed by the VE require "Language: - Level 1" as reflected in the Dictionary of Occupational Titles (DOT), there is a conflict between the DOT and the VE testimony which was not resolved by the ALJ, and remand is

necessary for a proper resolution of the conflict. The Commissioner argues there is no conflict with the DOT, but the VE testimony reveals additional information about the representative jobs. He argues the ALJ presented Plaintiff's language level as a range from a quarter to none. Finally, the Commissioner argues that the supposed speculation of the VE relates only to a hypothetical question upon which the ALJ did not rely.

Plaintiff's claim that the ALJ included nothing in his hypothetical regarding Plaintiff's ability to speak English ignores the context of this case. As the Commissioner suggests, the ALJ specifically stated that he wanted the VE to assume the hypothetical individual had a "two-year education in Laos with a quarter to none ability to read, write and use numbers." (R. 35). Although the ALJ did not specifically state in his hypothetical that Plaintiff cannot communicate in English, the VE was present at the hearing where he observed that Plaintiff did not speak in English but was speaking (and listening) through an interpreter for the entire hearing. In context with the ALJ's statement that the hypothetical individual had a "two-year education in Laos with a quarter to none ability to read, write and use numbers," it is clear that the hypothetical individual representing Plaintiff was unable to communicate in English. Moreover, the VE demonstrated that he was attending to Plaintiff's testimony when he informed the ALJ that although his work history report showed Plaintiff had a 9th grade education, he wanted to change the file to reflect Plaintiff's testimony that she had a 2nd grade education. (R. 35). In their colloquy in this regard, the ALJ and the VE both accepted Plaintiff's testimony that she had a second grade education in Laos. Id.

Plaintiff attempts to interject ambiguity into the hypothetical by stating that, "The ALJ did include the limitation of 'a quarter to none ability to read, write and use numbers,' however there was no indication whether the limited ability to read and write was in English." (Pl. Br. 18). Because a limited ability to read and write in Laotian is almost irrelevant to an ability to work in the national economy of the United States, there can be no question that the ALJ found Plaintiff has a quarter to none ability to read, write, and use numbers in English. As the regulations cited by the ALJ in regard to Plaintiff's ability to communicate in English make clear:

> Because English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language. Therefore, we consider a person's ability to communicate in English when we evaluate what work, if any, he or she can do. It generally doesn't matter what other language a person may be fluent in.

20 C.F.R. §§ 404.1564(b)(5), 416.964(b)(5) (as cited by the ALJ at (R. 20, finding no. 8)) (emphasis added). Moreover, the ALJ has no expertise, knowledge, or basis for determining what is the extent of Plaintiff's ability to read, write, and use numbers in Laotian, or any other language but English.

Plaintiff's argument (that it is unclear how many jobs are available in the national economy for someone with Plaintiff's RFC, age, education, and work experience) is premised upon Plaintiff's questioning of the VE. (Pl. Br. 18) (citing (R. 37-38)). Some background is necessary to understand this argument.

The ALJ presented a hypothetical to the VE which included a limitation to "no more than occasional and repetitive hand motions with the non-dominant left hand," and asked if there were occupations available for such a person at the light and sedentary exertional levels. (R. 35). The VE provided two representative examples at each exertional level, along with the numbers of jobs available for each occupation within the local area, the state, and the nation: (a) light exertional level occupations, (1) marker, with 4,190; 16,490; and 1,817,650 jobs respectively in each region; and (2) racker, with 1,230; 4,810; and 524,440 jobs respectively in each region; and (b) sedentary exertional level occupations, (1) polisher, with 430; 980; and 96,730 jobs respectively in each region; and (2) stuffer, with 810; 5,050; and 368,320 jobs respectively in each region. (R. 37). After the ALJ questioned the VE regarding additional hypothetical scenarios not relevant here, he allowed counsel for Plaintiff to question the expert. (R. 37). Counsel stated he just wanted to clarify the VE's testimony, and proposed a hypothetical similar to the ALJ's first hypothetical but in which the hypothetical individual was limited to occasional handling, fingering, and feeling with the non-dominant hand. (R. 37-38). He asked if the jobs to which the VE testified earlier would remain for such an individual. Id. The expert testified that, "those positions would still be available." (R. 38).

Plaintiff's counsel apparently recognized that much sedentary work requires use of both hands, and the following colloquy ensued:

Q   Even in the sedentary they would, they don't need the full usage of
    both hands in a sedentary?

| A | Not for the jobs that I, I mean, there are jobs in that sedentary job base where they're bilateral. But these two examples, you could do it with the other hand, the non-dominant hand. |
| Q | And how many other jobs would you say there are that you can do? Just representatives. |
| A | Just a percentage, like an erosion? |
| Q | Percentage, yeah. |
| A | There's probably going to be an erosion of at least up to 80 percent of the sedentary job base. |

(R. 38). Thereafter, the ALJ attempted to get the VE to quantify the number of jobs represented by the 20 percent of the sedentary occupational base that a hypothetical individual such as Plaintiff can perform, but the VE would not provide a number. He explained that the sedentary occupational base included 137 different jobs or occupations and approximately 20 percent of those jobs or occupations could be performed by a person with the abilities presented in hypothetical number one, but that he could not testify how many position that represented in the national economy without identifying all of the jobs or occupations from the DOT which are actually available to such an individual, determining how many positions are represented by each job or occupation, and then adding all of the positions together to obtain a total. (R. 38-42). Finally, the ALJ proposed that "the 20 percent could be millions of jobs," the expert responded, "Five percent could be millions of jobs, depending on," and the ALJ concluded, "All right, that's what I'm trying to get at." (R. 42).

Based upon this testimony from the hearing, Plaintiff claims it is unclear how many jobs are available in the national economy, that the VE and the ALJ merely speculated that there are a significant number of jobs available in the economy, that the remaining 20 percent of available jobs would be eroded much greater if Plaintiff's ability to communicate in English is taken into account, and therefore, remand is necessary to resolve this error.  The Commissioner argues that the VE's testimony related only to the hypothetical presented by Plaintiff's counsel which was not adopted by the ALJ, and consequently, there is no error.

As discussed above, the expert testified that the hypothetical presented by Plaintiff's counsel would not change his testimony.  (R. 38).  He went on to explain that the requirement to perform sedentary work with one hand and using the non-dominant hand "basically as a helper hand," would erode the sedentary occupational base by "at least up 80 percent."  Id.  Therefore, contrary to the Commissioner's argument, the 80 percent erosion of the sedentary occupational base does apply to the VE testimony regarding occupations relied upon by the ALJ.

The fact that the sedentary occupational base would be eroded up to 80 percent is irrelevant to the ALJ's reliance upon the VE's testimony however, because the VE testified specifically that the representative sedentary jobs of polisher and stuffer are available to an individual such as Plaintiff--with 1,240 positions in the local area, 6,030 positions in the state, and 465,050 positions in the national economy.  (R. 36).  Plaintiff, appropriately, does not argue that this is not a significant number of jobs in the economy.

Moreover, the expert testified that the representative <u>light</u> jobs of marker and racker are also available, with 5,420 positions in the local area, 21,750 positions in the state, and 2,342,090 positions in the national economy. (R. 36). The expert's testimony in this regard is clear, and the ALJ's reliance upon that testimony is certainly not based upon mere speculation.

Finally, Plaintiff claims the ALJ erred in finding there is no conflict between the VE's testimony and the DOT. This is so in Plaintiff's view because the ALJ found Plaintiff is illiterate and unable to communicate in English, whereas the representative jobs listed by the VE require "Language: - Level 1" as reflected in the DOT. Plaintiff argues that this constitutes a conflict which was not resolved by the ALJ. The Commissioner argues that no conflict exists because although a conflict might be assumed absent the expert testimony, the role of the VE is to go beyond the confines of the DOT and provide evidence of jobs which are available to a claimant based upon specific, individual abilities and specific positions.

In 1993, the Tenth Circuit recognized that the regulations offer two alternative means of proof of work that exists in the national economy--(1) administrative notice of job data from various publications including the DOT, and (2) use of vocational experts or other specialists. <u>Gay v. Sullivan</u>, 986 F.2d 1336, 1340 (10th Cir. 1993) (citing 20 C.F.R. §§ 404.1566(d & e)). The court noted that such a construction "comports with existing case law." <u>Id.</u> (citing <u>Warmoth v. Bowen</u>, 798 F.2d 1109, 1110 (7th Cir. 1986); and <u>Decker v. Harris</u>, 647 F.2d 291, 298 (2d Cir. 1981)). The court went on to explain,

what would be the point of vocational testimony (or expert testimony in general) if it could not reach beyond matters already established through administrative (or judicial) notice? Furthermore, the policy reasons mandating prudential limitations on the range of materials that may be noticed directly, without any adversarial scrutiny, do not apply to sources of expert testimony that may be tested by cross-examination.

Id.

Later, in November, 1999 the Tenth Circuit decided that before an ALJ may rely on VE testimony the ALJ has a duty to ask the VE how the testimony corresponds with the DOT and to elicit a reasonable explanation for any conflict. Haddock, 196 F.3d at 1089. The court made clear that the DOT does not "trump" VE testimony, but rather that the ALJ has a duty to investigate and get a reasonable explanation before he may rely on VE testimony. Id. at 1091. In June, 2000, the Commissioner acquiesced in the Haddock decision. Acquiescence Ruling 00-3, West's Soc. Sec. Rep. Serv., Rulings, 402 (Supp. 2003). He ultimately published SSR 00-4p, effective December 4, 2000 regarding this issue. West's Soc. Sec. Rep. Serv., Rulings, 242-47 (Supp. 2010). In SSR 00-4p, the Commissioner established a policy interpretation for the use of VE testimony and "Other Reliable Occupational Information in Disability Decisions." Id. at 243.

In SSR 00-4p, the Commissioner placed two duties on an ALJ. First, the ALJ must "identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs . . . and information in the Dictionary of Occupational Titles (DOT), including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO)." Id. Second, the ALJ

must "[e]xplain in the determination or decision how any conflict that has been identified was resolved."  Id.  Thus, SSR 00-4p places the affirmative responsibility on the ALJ to "[a]sk the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT," and where VE "evidence appears to conflict with the DOT, . . . [to] obtain a reasonable explanation for the apparent conflict."  Id. at 246.

In the hearing, at the end of his examination of the VE, the ALJ asked if there are any inconsistencies between the VE testimony and the DOT, and the VE responded that there are none.  (R. 37).  In his decision, the ALJ found that, "Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.  (R. 21).

Plaintiff's claim that there is a conflict requiring remand fails.  As required by law and the Social Security Rulings, the ALJ asked if there were inconsistencies between the VE testimony and the DOT.  (R. 37).  The VE replied that there were none.  Id.  Thus, the ALJ fulfilled his first duty pursuant to SSR 00-4p.  Plaintiff cross-examined the expert, and his questioning did not even attempt to suggest that there are conflicts between the VE testimony and the DOT.  Plaintiff did not direct the ALJ to record evidence or to admissible authority that there is a conflict despite the VE testimony, and did not argue to the ALJ that the VE testimony was erroneous.  Thus, the administrative record contains no evidence that the VE testimony and the DOT are inconsistent as alleged by plaintiff before this court, and no hint that the ALJ's second duty pursuant to SSR 00-4p (to explain any apparent conflict) was triggered.

Before this court, plaintiff argues directly from the listings in the DOT, but without pinpoint citation to that authority, that there are, in fact, conflicts between the VE testimony and the DOT. (Pl. Br. 17). The court recognizes that an ALJ must take notice of the DOT listings as authoritative information regarding jobs in the economy, and where the ALJ has not, the court in appropriate circumstances will do so.

Neither the ALJ, this court, plaintiff, nor plaintiff's counsel are experts in vocational matters with the expertise to interpret the DOT contrary to the interpretation given by the VE. Plaintiff simply presents no basis in the record evidence, or legal or vocational authority to find otherwise than as testified by the VE. Plaintiff presents no authority whatsoever that any DOT language level requirements regarding the specific occupations and positions at issue here are otherwise than as testified by the VE. While one might argue, as Plaintiff has, that the DOT requires greater literacy than Plaintiff possesses in order to perform these jobs, it has also been noted that "a claimant's 'reliance on the <u>DOT</u> as a definitive authority on job requirements is misplaced' because '<u>DOT</u> definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range.'" <u>Page v. Astrue</u>, 484 F. 3d 1040, 1045 (8th Cir. 2007). Moreover, the purpose of VE testimony is to go beyond matters established by administrative notice. Recognizing "Language: Level 1" as the <u>maximum</u> language level required of any position within the occupations included in the DOT listings, the court sees no specific conflict between the information presented in DOT and the VE's testimony. The VE was aware of Plaintiff's language limitations as evidenced

by use of the interpreter and as instructed by the ALJ, and testified that there are almost three million positions in the national economy within the representative occupations which Plaintiff has the capability to perform.

Even if the court were to find an apparent conflict, lacking vocational expertise, record evidence, or other admissible authority to establish that a conflict actually exists, the court would be compelled to accept the VE's undisputed testimony. Plaintiff's or her counsel's mere assertion as lay observers that the DOT listings require a different finding than that testified by the expert are insufficient to contravene the direct testimony of the expert. The court may not reweigh the evidence or make its decision based upon evidence outside the record. The only record evidence is the VE testimony that the DOT is consistent with the VE testimony. The ALJ followed the dictates of SSR 00-4p, and the record evidence reveals no conflict between the VE testimony and the DOT. The court finds no error in the ALJ's consequent decision to rely upon the VE testimony.

**IT IS THEREFORE ORDERED** that judgment be entered in accordance with the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

Dated this 4th day of April 2011, at Kansas City, Kansas.


s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**